Welcome everybody to day two of this four-day sitting in Montgomery. Judges Brasher and Wilson and I are grateful that you're here with us. Before we get going, just a couple of rules of the road. Many of you are probably familiar with the procedure here, but most importantly, please know that we've read your materials. So we've read the briefs, the underlying cases, the record materials, the statutes, whatever. So don't waste your own precious time with us with a bunch of factual and procedural ramp-up. Just go. Just get to it. And we'll have questions for you along the way. You'll understand the traffic light system, green go, yellow slow, red, I'd ask you to stop. I am notoriously bad about stopping people in the middle of a sentence. I'm trying to get better. And I actually tried to flex my muscles yesterday a little bit to stop people. So just recognize the red light and wind up when you see it. If you're answering a question of ours, you have permission to finish it. But otherwise, please finish up. Okay. Very well. Let's go to the first case. United States v. Ewing, 24-11308. Tell me how to pronounce your last name. Kime. Kime. Kime. Ms. Kime here for the appellant and Ms. New here for the appellee. Ms. Kime, you've observed three minutes for rebuttal. Very well. File away. May it please the Court, Counsel, good morning. My name is Stacy Kime and I represent the appellant, Andrew Ewing. Mr. Ewing had a property interest in the files on his home desktop computer, an interest which was not extinguished by his use of the BitTorrent protocol. The government invaded that interest using a super sensitive instrument which is held only by the police. Now, importantly, BitTorrent files are unique among peer-to-peer software platforms in that they are stored directly on the user's computer. Is this, by the way, is this why you say that in addition to violating sort of the cat's reasonable expectation of privacy, it's a physical invasion because the files are stored on the hard, sort of the brick and mortar device, so to speak? That's correct, Your Honor. Torrential downpour in this case went directly into Mr. Ewing's home and directly onto the computer located inside his home. And that was a trespass because the government occupied Mr. Ewing's network in a manner which excluded other peers. What about the bit in Jones that basically says, yeah, yeah, digital searches, they'll be subject to cats? So I think the language from Jones is a bit more narrow. It says digital searches without trespass are subject to cats. And in this case, torrential downpour did commit a trespass under the common law. Like all users, Mr. Ewing set an important capacity limit. Did you make the same argument to the district court that this constituted a trespass rather than it violated his rights to reasonable expectation of privacy? Your Honor, you're correct that below, the defense relied primarily on cats concepts. What I would submit is that the overarching issue is preserved as well as the narrowest possible formulation of the question before this court. The narrowest possible way to define the question before this court is whether the government action here is more like a So we're applying plain error review to your argument then, right? Your Honor, I believe the error is preserved and the issue is preserved. The narrowest possible way to define the question before the court today is whether this case is more like a modern Jardines, or alternatively, is it more like a modern Cobias and place? And on that question, the district court and the defense below squarely disagreed. And I would cite docket 76, pages 85 and 90, where the district court said, but aren't the police just allowed to be better at doing all of this? Isn't this like searching someone's using a dog in an airport? Obviously referencing Cobias and place. The defense counsel responded at page 90. This case is qualitatively different because the, you know, quote unquote suitcase was constructively inside Mr. Ewing's home. I don't think there's any other way to interpret that interaction between the defense attorney and the court other than a disagreement as to whether this case is more like Jardines or more like Cobias and place. And our argument on appeal is essentially that this case is on all fours with Jardines. Now what's critical here- Let me, let me ask you one thing. So one difference it seems to me is that by having, by having BitTorrent, he is in fact sharing his, you know, videos, whatever they may be, child pornography, legal videos with other people that are on that network, right? That's correct, Your Honor. But he's allowed to set boundaries on who and how his constitutionally protected areas can be accessed. So in Jardines, the aromas from Mr. Jardines' home were arguably exposed to the public. Girl scouts, neighbors, even a police officer without a dog. In Jardines actually there was a second officer who arrived later with no dog. Yeah, but that's, I mean, and I don't, I understand the analogy you're drawing and I don't necessarily disagree with it in some respects, but it seems different here where, where the setting on BitTorrent says share and he's not, he doesn't know who he's sharing with. He just knows it's other people using BitTorrent. When you've got something in your house that may be like emitting an odor or something, you haven't said like, I want to share that odor with everybody, just not the cops, right? Yes, Your Honor. Perhaps if we use a hypothetical, taking things to common law terms. Say I get a brand new horse in the 1700s and I invite anyone to come over and they can sit on my horse and check it out, but only for a second, only for a second, because it's my horse. You can come onto my property and you can sit on it, but only for a second. That would not authorize a police officer to come onto my property, knock somebody else off of my horse and sit there for over four hours, the entire time probing the saddlebag with a sophisticated spy tool and depriving anybody else of the ability to take me up on my offer. That's exactly what you're asking for. So how long here was he sharing, publicly sharing these files with other BitTorrent users? Was it more than a second? How long was it? For milliseconds. And that's because of the way that the BitTorrent program relegates all users to the download swarm. So anybody who is trying to access Mr. Ewing's files... But he's still sharing it for a period of time, right? With other BitTorrent users. Certainly. In my hypothetical, I would be sharing my horse for a limited period of time, but that would not give a police officer the right to stay on for four hours and certainly it would not give him the right to knock off other users. When you say he's only sharing it for a few milliseconds, you just mean under the normal BitTorrent operations, that's how it works. Like I draw from him for a few seconds and from this other person for a few seconds. That's what you mean. You don't mean that he sat there and he like clicked the button to share and then unclicked it immediately. Exactly. Okay. So he's actually sharing it for a long time. It's just each individual user is just grabbing it for a few seconds at a time. Yeah. He's opened the gates for a while just that when other people come in, they're only there for a millisecond. They're only there for a millisecond and they're only able to determine information that's... The information that an ordinary user could determine is significantly and vastly less than anything that the officers... So that's one question I have. I don't think I quite understand why it is that the sort of aggregability, that torrential downpour, this feature that it gives the police, why that meaningfully extends any invasion of privacy. It's like you've shared, you've opened up for sharing each little tile in the mosaic or something and what torrential downpour allows the government to do is to assemble the mosaic quickly, right? Torrential downpour actually allows them to assemble the mosaic in a way that they wouldn't otherwise be able to. But I guess what I'm saying is that everybody out there has the tiles or can get the tiles. Well, actually not while torrential downpour is operating and that's the trespass. So every user on BitTorrent sets a capacity limit on how many people can simultaneously download. That's at docket 76, page 116 to 117. Torrential downpour comes in and physically occupies one of those spaces, not for seconds that have been authorized by Mr. Ewing, but for over four hours in the first connection alone and there were 16 other connections. During that entire timeframe, the connection that Mr. Ewing has created for sharing is completely unavailable to other peers. So it is exactly like if a police officer walks up to a horse and physically knocks someone off and doesn't let anybody else on. Is the reason that the physical trespass theory has become or has sort of like taken front and center because the district court made factual findings about your client's exposure of this information that would seem to undermine any reasonable expectation of privacy that would be hard to overcome? I agree that the trespass argument here is factually stronger. I don't think that the court's findings on the reasonable expectation of privacy are necessarily correct and we are still lodging a reasonable expectation of privacy argument. That argument hinges largely on principles from Kylo and Jardine's, the use of the sophisticated tool. But I do agree that the trespass argument here is stronger because we have a pretty clear case of the government coming in and occupying Mr. Ewing's network in a manner which excluded other peers and even in the government's authority would support the idea that this is a trespass. The government cited to Stanley in its brief as a Third Circuit case. Mr. Stanley's case is factually distinguishable. The software that the government used in Stanley is extremely distinguishable. It was readily available to the public. It was unsophisticated. It was highly visible and only captured things outside the home. Also false squarely within Jacobson. But what's important about Stanley is that Stanley's behavior is very similar to the government's behavior in Mr. Ewing's case. And in the Third Circuit rightly called Mr. Stanley a cyber trespasser for occupying someone else's network. Interestingly, the lead detective in Stanley was Rob Erdely, the same officer that created the software here. So if we apply plain error review to the trespass argument, you haven't presented any binding precedent that the use of this torrential downpour over a peer-to-peer network constitutes a trespass. If we have to apply plain error review, I would have to cite two kind of implicit propositions from Joan and Jardine's. So let me ask you this just about, so I understand the physical trespass, and I'll confess I have tried to understand the technology. I may not have it exactly right. But is the, are you saying it's a physical trespass because there are little atoms or electrons or whatever that are actually invading a space? Is that what it is? So there are two theories of the trespass. Yes, one is that microscopic particles are sufficient to support a trespass cause of action. Although I would note that at common law, neither physical contact nor damages were required for trespass. But I think also there's separately the issue that he's occupying Mr. Ewing's network in a manner which excludes other peers, which I think is absolutely a trespass. So at common law, like a siege of property essentially would have been a trespass? Because that's what you're basically saying is that he besieged the network. That's correct. Or sorry, not he, they, the government besieged the network. Yes, Your Honor. At common law, beating a horse would be trespass. Well, surely beating. I'm sorry, I think I misunderstood the word siege. Oh, yeah. No, I mean like surrounding the town with the troops or whatever and not letting anyone in. That's a trespass into someone's home or something? I believe even false imprisonment was considered a trespass at common law. I don't mean to distort the info. Here's a question I have on the trespass theory. I mean, so trespass is still a cause of action that exists. Is this, is this something that state courts have said, this is a trespass and so you owe damages to someone for downloading something from their computer? The concept of damages is actually a complex one once we start layering it onto common  Well, whatever. I mean, I guess I'm just trying to figure out like, I mean, this is an interesting theory that you have, but I feel like I'm litigating like a torts hypothetical in the context of this Fourth Amendment case. I mean, I, like, I understand if you touch a horse, that's a trespass on chattel. Has, I guess, just my question is like, has any state court said you downloaded something from someone's computer or maybe hacking or something like that? Yes, Your Honor. Has said like that's a trespass under common law? Yes, Your Honor. The Stanley case does call Mr. Stanley's behavior trespassing, but I would also reference cases from my brief, Ackerman, CompuServe, ThirstyTel, and May. They're not directly on point for your hypothetical. They obviously contain some factual distinctions. I would also point out that a common law, it was presumably a trespass to yell at a horse with the goal of scaring it away. So there was no need for physical contact. And surely if that were a trespass, then sending a hologram down the road of my likeness to accomplish the same result would similarly be a trespass. Okay, very well. Thank you. All right, Ms. New, let's hear from you. Good morning. May it please the Court. Jordan New here on behalf of the United States. The government's perspective is this. The most important fact in the record about this case is that Torrential Downpour could not access anything at the time that download was initiated that Mr. Ewing had not made publicly accessible on the BitTorrent network. From the government's perspective, that resolves the reasonable expectation of privacy question, but it also reserves this trespass question that has now been arisen on appeal. I do want to say at the outset, the government's position is this trespass theory should be reviewed for plain error. I think this is a complicated question. There's factual information, I think, about how BitTorrent works that would be helpful to answer this question of trespass and how it was— I'm going to ask you a question about plain error, about plain error review. You can fail to preserve an issue, but can you fail to preserve an argument? It's a Fourth Amendment issue, right? It is a Fourth Amendment issue, but I think to construe these two doctrines to be subsumed into one issue would be to say you can argue that your Fourth Amendment rights were violated and then you've preserved every sort of argument. Well, isn't that what Yee v. City of Escondido says, right? I mean, Yee, it's a takings case, and the argument below was physical trespass or physical occupation, the physical occupation theory of a taking, and then on, you know, sort of on appeal to the Supreme Court, they want to argue regulatory takings, and the Supreme Court says, that's fine. Isn't that this case? No, I would disagree, and I think it would be news to every court that has reviewed these constitutional questions over and over, and even the Supreme Court, to know that they should also be evaluating whether or not, when you're faced with a question, a very particular question that's premised on a different factual circumstances, when you're evaluating the reasonable expectation of privacy question, that you also need to be assessing whether there's been a common law trespass. I also think Justice Gorsuch made this point in his dissent in Carpenter, is that there are these two separate analytical ways of approaching these search questions now. It's very clear after Jones that there's a separate trespass theory, but litigants are not raising it. They're forfeiting these arguments by not presenting them and teeing them up, and so I do think the government... Well, I mean, it's one thing if they don't raise it at all, but I mean, here it's just that they didn't specifically raise it. Let's just assume they didn't specifically raise it in the district court. I mean, I guess I'm concerned with the idea that you are limited to the specific theories of a search that you propose in the district court. I mean, oftentimes these are just like objections that you make to evidence being admitted. It just seems very odd to say that you would be limited to the specific theory when you made the objection. Well, I think that they're not just specific analytical or legal theories. They also have different factual underpinnings too, which is why we're at a disadvantage here now on appeal talking about whether or not there are certain electrons that connect and how that could be a theory of trespass. Well, if that's the case, though, I think that that tends to go in your favor. I guess my point would be like, if you don't... If there is some absence of the record, you didn't make a record on it, then you would rule in favor of the district court. The district court didn't error. I mean... And I agree with that, Your Honor. I actually agree doubly in this circumstance because it's the defendant's burden to prove that there was a search in this case. And so to be clear, the government's position is the record as it exists today is sufficient enough for this court to say there was no trespass, that a trespass theory would fail. But I do think it is a substantial and significant legal question, especially after Jones about how electronic downloading and communications between a target computer, a server with some somewhat sophisticated technology or programming and protocol, and then how that could translate to a trespass. And so the government's preference's view is that this is a significant and substantial question and it probably would be better for everybody if this is something that's decided on a really robust record. But even setting that aside, again... Can I ask you just one more question? Because this is... It's not even a fascination. It's an obsession of mine. This distinction between issues and arguments, I tell my clerks that this exists in every case. If you squint hard enough, it exists in every case. Does the government, because you're a repeat player, does the government have a theory about distinguishing issues from arguments? Because I don't think your response, frankly, which is like different factual underpinnings, is not a crazy response. That might be a decent sort of proxy for when something ceases to be an argument and becomes an issue or something like that. But I just wonder if the government has sort of thought this through. You don't have to. I don't mean this as a quiz show. No is an appropriate answer to that question. I don't have an answer either. I will say sometimes when framing my briefs in response, because like you said, it is... I do confront that issue, right? Sometimes we don't want to stray too far from what was before the district court. But sometimes in our own review, we do see things outside of what was argued. And I've been guilty of definitely injecting issues on appeal and being told, government, you can't do that. So I do take that it's a difficult question. I just think here, because there are so... There's two so clearly distinct doctrines about... In case law, there's vast body of case law applying these two different theories of a search that have different factual underpinnings. And of course, there is going to be overlap. Because for instance, in the context of a home, you obviously have strong possessory interests and privacy and also privacy interests in your home. And it comes in part from your property rights that you have in your home. So there's certainly going to be overlap. I just think here, and again, some of the questions that we're getting about electrons and about the way this works. I mean, we called the co-developer of torrential downpour. So if we really wanted to get into the weeds, the precise weeds of how the law enforcement computer interacted with Mr. Ewing's computer, we could have done that if we were on notice that we were going to be confronted with a trespass issue on appeal. My concern is I don't know what I don't know. So it could be maybe there's not more helpful information, but maybe there is. And below, we were not on notice that this was going to be what we were arguing about. That being said, I think the key fact is clearly in the record, which is that torrential downpour, the way that it works, it exists and operates within the BitTorrent protocol. So it could obtain anything at all that Mr. Ewing was not publicly sharing. And I think the fact that it was publicly sharing resolves this under both theories. So for instance, if torrential downpour had, and the way that it works is it searches by hash value to a particular torrent. So if torrential downpour had tried to search Mr. Ewing's computer and Mr. Ewing had deleted the files, it's going to come back with nothing. If torrential downpour is trying to search Mr. Ewing's computer, I probably shouldn't use the word search, but if Mr. Ewing tries, or excuse me, if torrential download tries to obtain files from Mr. Ewing's computer and Mr. Ewing has disabled the sharing features, it's going to come back with nothing. The other key thing about torrential downpour is that it's only a very narrow class of files that it's looking for. And it's files that law enforcement has previously, or excuse me, it's targeted a torrent that law enforcement has previously identified to contain child pornography files. So it's not the case that torrential downpour just pings Mr. Ewing's computer and says, hey, give me everything you're possibly sharing on BitTorrent. We want everything. We want to see what you've got. It's a very narrow search or request to download. Yeah, but that doesn't matter though, under your theory. I mean, that's nice that the government's doing that, but that doesn't matter. I agree. I agree. But I think it goes to the reasonableness, back to the subject, or the expectation of privacy. I think it goes back to the reasonableness and the society's interest in this information, right? We know from Carpenter there are limits to how much arguably, Carpenter was a public information case, but it was a third party doctrine case. And the nature of the search, the nature of the information the government obtains can matter. I think you're right, absolutely. Judge Brasher, if we wanted to obtain everything, I don't know why we would do that, but I think it puts us in a better position on appeal because it is a very, very narrow scope. Can you answer this question, which may be in the record, maybe not, and maybe I just missed it. So I understand the idea of BitTorrent and people kind of grab pieces of files and that makes it all work more efficiently and all that kind of stuff. But what if there's just one, like one person has a video? Would BitTorrent then say like 100% of the download is from that one person? Yeah, the government actually solicited testimony about this. There's an example in the record about like a photograph that's taken and it was from Rob Eardley, our expert, about if I'm the only person in the world on BitTorrent who has this photograph and you come in and you try to search for it, you're going to do a person a person, a single person download. And that's basically the way that torrential downpour manipulates this. So what torrential downpour does is it just forces a thing that BitTorrent allows in a circumstance where there was just one person that has to focus on it. And that's obviously not the intended use of the BitTorrent network. It's designed to be more efficient so you can pull things from a lot of people. But there's nothing in the protocol that precludes that. And in fact, our expert testified that it does happen naturally every day. It's just circumstance specific about who's online, what's available, how many other people are simultaneously trying to download these things, which I think is what's interesting about this case. And Judge Ucimuri sort of made this point. I think we could all agree if we're talking about the individual pieces, law enforcement could just log on to any BitTorrent client, a regular BitTorrent client, and start to try to initiate a download and could download any number of those individual pieces from Mr. Ewing's computer. So I think it would be hard to say that that was a trespass and that's a reasonable expectation of privacy. But I think the rule that Mr. Ewing wants this court to adopt is while you don't have that sort of interest with the individual pieces, for some reason the government collecting them all together changes the calculus. And I just don't think that's the way the Fourth Amendment has ever been determined to apply. Law enforcement doesn't get penalized for working more efficiently to obtain information that it cannot lawfully obtain, either because it's public or it's viewable. And so the government's perspective is the fact that we're operating within the bounds of torrential downpour, that if Mr. Ewing, and this was a factual issue below about whether or not Mr. Ewing had disabled his settings and tried to prevent law enforcement from accessing these files, and the district court resolved that in our favor and said absolutely there's no evidence, credited our expert that there's no way that torrential downpour could get anything at all that he wasn't publicly sharing. If I can interrupt you with a few minutes that you have left, and Ms. Kant didn't discuss the issue during her initial argument, but she does have rebuttal. I have a question about the publishing of the videos to the jury. How many minutes total did the government have that were admitted in the evidence? How many minutes? Altogether. So that were published or that were admitted? That were admitted. That I'm, Your Honor, to be candid, I'm not sure. I know some of the video, I know- Six minutes, 36 minutes. Of child pornography evidence that was admitted? That was admitted. I do not know. I have not seen the exhibits, so I do not know the answer. So how many minutes were published? So I do know the answer to this question. Let's see. Grab my notes here. So we admitted seven videos. The first five of those, they were short like clips. So some of them was five seconds, five seconds, three seconds, six seconds. The first one was a 26 second clip. And then the last two videos were longer. It's unclear in the record how much was actually shown, but it does, the prosecutor did indicate when the video was stopped. And so it indicates it was stopped in one case, like three minutes, 38 seconds into the video and two minutes and 36 seconds into the video. I know that sounds terrible. That sounds to me like a lot to subject the jury to. And I understand, you know, the 403 argument, but it seems like there comes a point when there's so many of these videos that the prejudicial nature of the videos outweighs their probative value. I don't disagree with Your Honor. Again, I have not seen these videos, but I did ask the trial attorney on this when I was preparing this brief because I too was concerned about looking at that and saying, did you make them watch three minutes of child pornography? And my understanding is those were like webcam type videos, that not all of the content of those was sexually explicit. And so I don't think, and I think Judge Hinkle, I'm pretty sure the introduction of this evidence came in before the issue was re-raised with Judge Hinkle. And I'm pretty confident that Judge Hinkle stated on the record that nothing the government did was overly inflammatory or prejudicial. Can I ask you a follow-up about this? So are we talking about admission of these as evidence or publication to the jury? So I thought Judge... Publication. Yeah. So is there, I guess, is there, and maybe I should be asking your adversary, but is there an objection here to the admission of the videos as evidence? No, there was never an objection to the admission. So maybe this is the dumbest question of all time, but then why is 403 even relevant? 403 refers to the admission or exclusion of evidence. I actually agree with Your Honor. I had that thought as well. And I don't think I cited to it in my brief, but I do recall encountering some case law that seemed to indicate that publication, because publication is almost like sort of a different avenue of admission. I believe I did find case law that indicated that it would cover the publication of exhibits. But to your point, I think the fact that they're admissible sort of moots the prejudice of this, right? It'd be like saying you can allow this... So that means that if you showed all the videos to the jury, you wouldn't have a 403 objection? I'm sure we would have an objection. If they had to sit there for hours and hours, and looking at child pornography for hours and hours, you wouldn't have a 403 objection? I take the point. I think in this context, and given the nature of what Mr. Ewing's defense was, the evidence, the presentation we made was highly probative and not unfairly prejudicial. And again... The defense was that he didn't know this was child pornography, right? I mean, it's the classic sort of statutory rape defense of like, how was I supposed to know these were kids? That's exactly, Your Honor. I see my time has expired. Okay. Very well. Thank you so much. All right, Ms. Keim, you've got three minutes remaining. Thank you, Your Honors. I just wanted to clear up a couple of the facts. The torrential downpour does reveal information that no ordinary user could discover. Mr. Ewing has not made public the list of files on his home desktop computer, a list that becomes visible to the police only through the use of torrential downpour. For that proposition, I would cite Docket 111, page 52. Can I ask you just one question about this? And it's about the factual findings, right? I mean, so the district court found that torrential downpour merely aggregates data which appellant by using the tort made publicly available. So do we have to find that that's clearly erroneous in order to sort of travel the road you're suggesting? Yes, Your Honor, that finding is clearly erroneous. And the record is fully developed. Docket 111, page 52, the lead detective admitted that only through torrential downpour could the police determine exactly which pieces of a torrent file Mr. Ewing possesses. Can I ask you to address this hypothetical and tell me why it doesn't make any sense? Because I'm sure that's what you're going to say. So let's assume that there's like some kind of terrorist radio network, right, where they're sending out radio waves to communicate their sort of terroristic activities to each other. And the cops pick up that network and they use some kind of special technology to tell them where those radio waves are coming from, right? It's not technology that the normal person has. You could listen to it, but you wouldn't know where they were emitting from. Is the use of that technology a search? It would depend. In your hypothetical, the technology is not available to the public. Yeah, it's not available to the public. It's something the CIA has. And they use it and they say like, this is the house that is emitting these radio signals to communicate with this terrorist network. So that would make this case a search, I would think. Think that would be a search? Absolutely. Okay, how can that be, I guess, Isma? If the person is emitting the information to the public, how is it that the use of some kind of special technology to like pick that up and understand where it's coming from? I guess, how is that a search? I think that we would need more facts. Now that I'm considering and reflecting a bit more, I think we would need more facts about what kind of expectations of privacy existed on the network that we had there. Okay. Whereas in our case, what we know is that the police did, you know, circumvent the limits of Mr. Ewing's boundaries, the boundaries of the torrential, excuse me, of BitTorrent. I also wanted to point out that the torrential downpour reveals more than mere contraband. It makes public to police the list of files on his computer. And it also, in this case, wound up producing successful downloads of files that were not contraband. I think it's important to remember that the initial file here contains 7,000 discrete files, and only one of those was suspected to contain contraband. For that, I'd cite docket 62, page 84. Can I ask you to address the evidentiary issue that Judge Wilson raised? And so when I look at this case, you know, I've seen a lot of death penalty cases in my day. And usually, you know, the prosecutor says, look, I want to introduce these pictures of the crime scene. And the sort of the rule is kind of, well, that's relevant, but, you know, you can't go overboard with the crime scene photos. Is that the kind of analysis that we should have here? Is just the question is like, look, this was relevant, but you just can't go overboard with it? Yes, and I think the question of what is overboard is very fact specific. I think in this case, the fact that Mr. Ewing's defense basically conceded that these did constitute child pornography is a factor in favor of the defense. It made the substantive nature of the documents or the actual files far less relevant, far less probative. Yeah, but what about his defense that he didn't know it was child pornography? Right? Wasn't that his defense? He didn't. So his defense was that prior to downloading it, he didn't know that it was child pornography and didn't have to become aware of it at any point. So that wasn't helped. Does it really matter then what the photos look like if he's just like, I never watched it? Exactly, but it's certainly going to matter to the jury, that exposure to the prejudicial information. For those reasons, we would ask the court to reverse and remand the case for a new trial. Very well. Thank you both. Thank you for respecting the red light, the both of you. Well done. All right, that case is submitted. We'll move to a case.